IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| KAREN SCHULTE, | ) |
| | ) |
| Plaintiff, | )   CASE NO.  18-CV-1306 |
| | ) |
| v. | )   JURY TRIAL DEMANDED |
| | ) |
| C & C SALES, INC., *dba* "C & C GROUP," | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Karen Schulte, for her Complaint against Defendant C & C Sales, Inc., states as follows:

### The Parties

1. Plaintiff Karen Schulte is a citizen of the State of Missouri, residing in St. Louis, Missouri.

2. Defendant C & C Sales, Inc., *doing business as* C & C Group ("C&C" or "Defendant") is a Kansas corporation, having its principal place of business in Kansas at 10012 Darnell Street, Lenexa, KS 66215.

### Nature of the Action

3. Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") for hostile work environment discrimination, particularly to remedy the illegal and discriminatory adverse employment actions taken by Defendant against Plaintiff in which Defendant created, maintained, and subjected Plaintiff to a hostile and discriminatory work environment, wherein which she was repeatedly harassed because of her gender, as well as intimidated

over the course of several years, by several of Defendant's agents, including Plaintiff's coworkers and her direct and indirect supervisors; the pattern of hostile work environment sexual discrimination culminated in Plaintiff's constructive discharge from C&C – when Plaintiff finally could no longer bear the hostile work environment and decided she had to resign.

### Jurisdiction and Venue

4. This Court has original, federal question jurisdiction over Plaintiff's Title VII and Section 1983 claims pursuant to 28 U.S.C. §§ 1331 and 1337.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims occurred in this judicial district.

6. In addition, diversity jurisdiction exists as Defendant is headquartered in Kansas, Plaintiff resides in Missouri, and the amount in controversy exceeds $75,000.00

7. Plaintiff brings her federal and state statutory claims on a timely basis pursuant to the procedural requirements of the Equal Employment Opportunity Commission (the "EEOC") in that on May 10, 2018, the U.S. Equal Employment Opportunity Commission ("EEOC") issued to Plaintiff its Notice of Right to Sue (the "Notice"), permitting Plaintiff to file a civil action based on the grievances Plaintiff raised in her EEOC Charge No. 560-2018-01312 ("Charge 560"). A copy of Charge 560 is attached hereto as **Exhibit A**. This lawsuit has been filed within 90 days of the issuance of the Notice.

### Facts

**Background of Plaintiff's Employment and Achievement**

8. Plaintiff was hired as a "Service Coordinator" by Mike Wade, General Manager of C&C, on February 10, 2014, at a starting salary of $48,000 per year.

2

9. The facts surrounding the next four years of her employment are heart-wrenching: despite Plaintiff's obvious success, Plaintiff's employment was cut short as Defendant's persistent harassment became - even for a person as strong as Plaintiff - unbearable, especially amid Defendant's refusal to properly protect Plaintiff when she complained of the discrimination she endured.

10. During Plaintiff's tenure from 2014-2016, Plaintiff - due to her superior talent amongst a high employee turnover - was promoted to several roles: Plaintiff, *inter alia*, took on the following roles that were not within her entry-level duties:

   a. supervised technicians;

   b. wrote and administered performance reviews;

   c. hired new employees;

   d. ordered all parts for service and construction, and scheduled jobs accordingly;

   e. sold service contracts;

   f. visited customers;

   g. handled all warranty parts and returns for service and construction jobs;

   h. settled customer complaints in the role of a manager;

   i. scheduled and organized quarterly safety meetings for all technicians, managers, and project managers;

   j. arranged company outings, customer appreciation barbeques, and documented all events for the same;

   k. settled disputes between employees; and

   l. instigated a culture of discussing office financials and 5-year plans.

11. Plaintiff worked long hours (far surpassing the basic requirements of the job), came into the

office on weekends, and cancelled vacations; she was available 24-7 via telephone for any emergency that occurred.

12. Previously, the roles she was promoted to were the responsibility of 3-4 employees; Plaintiff handled these responsibilities all on her own.

13. Plaintiff received exemplary performance reviews for 4 years from managers, proved to be an excellent leader, received numerous compliments from customers regarding her dedication and commitment to operations, and was elected as "Employee of the Year" by her peers and employees.

**Plaintiff Endures Initial Harassment and Harassment is Reported Three Times to No Avail**

14. In the balance of Plaintiff's complaint, Plaintiff will relay examples and specific instances of Defendant's discriminatory conduct, all of which were part of an ongoing pattern of hostile work environment discrimination; the specific acts enumerated herein were in no way discreet or isolated (although they are separately discussed herein), but part of that ongoing pattern of conduct which created a hostile work environment and culminated in Plaintiff's termination from C&C.

15. Plaintiff was thereby promoted to the role of "Service Manager" in October of 2016, and was given further responsibilities.

16. With these responsibilities, Plaintiff was offered a substantial raise and benefits, including a base salary of $85,000 per year, a 1% bonus on annual gross margins, and a gas allowance of $600 per month; due to Plaintiff's dedication, she essentially doubled her salary and benefits in only *two years*.

17. Following this promotion, Plaintiff received continuous harassment from Mike Landwehr, a colleague of Plaintiff, who frequently claimed (and made statements to the effect of) Plaintiff was a "woman in a man's position."

18. Landwehr's conduct, beginning particularly after her promotion, gradually become more and

4

more pervasive, threatening, and discriminatory.

19. Following the theme that Plaintiff was "doing a man's job," Landwehr made literally *countless* sexually-discriminatory statements to both Plaintiff and other co-workers to the same effect – that Plaintiff was "doing a man's job," Plaintiff was not cut out for the position, and like comments.

20. In addition, Landwehr helped to create an extremely hostile, sexually-discriminatory work environment against Plaintiff; frequently making such comments to others as well in and around Plaintiff.

21. Through the later part of the year in 2016, Plaintiff reported, *inter alia*, this harassment by Landwehr to Chuck Howington, General Manager at that time, and Mike Johnson, Operations Manager.

22. Plaintiff was assured by Howington that he would speak to Landwehr regarding the matter.

23. However, the harassment continued; in fact, if anything, it grew worse.

24. The harassment already had grown, and continued to grow, so pervasive and bothersome that Plaintiff began to be uncomfortable at nearly all times at work, and began to dread coming to work every day.

25. In 2017, Plaintiff assumed responsibility over construction operations as well as service operations; at all times, the harassment by Landwehr continued, incessantly.

26. In mid-2017, Plaintiff again reported her harassment by Landwehr to Wade, who had recently re-assumed the role of General Manager, so that he too was made aware.

27. Plaintiff was again assured that the matter would be discussed with Landwehr.

28. However, the harassment continued the same as before.

29. In September of 2017, Jim Watts, Engineering Manager, and Dan McVey, Construction

Manager, met with Wade; Wade testified to them about the harassment Plaintiff was receiving from Landwehr.

30. Following this meeting, no effective action was taken and the harassment persisted.

31. Even worse, however, after reporting Landwehr's sexual harassment to Wade, Wade took on a hostile attitude of his own against Plaintiff; indeed, Wade's negative conduct toward Plaintiff began and steadily increased right after her complaints to him; thereafter, Wade began treating Plaintiff in a markedly negative manner compared to similarly –situated male employees.

**Plaintiff Attempts to Take Her First Day Off in Seven Months But Instead Endures More Harassment**

32. Later that month, in September 2017, Plaintiff entered a vacation request.

33. Wade approved and confirmed this request.

34. Yet while Wade was in Kansas City to meet with Paul Strohm, Owner and President, and Mary Baragary, HR Manager, he nevertheless told Strohm and Baragary that Plaintiff had taken a vacation day *without approval*, creating a negative impression of her with the Kansas City Managers.

35. This negative impression was unwarranted: in fact, Plaintiff had previously cancelled two vacations in 2017 due to her concern of rampant employee turnover; Plaintiff not had taken a vacation day in over seven months; and plenty of other male employees had taken multiple days off, without question, since Wade's re-hire.

36. Following the incident, Plaintiff received an email from Human Resources, demanding that she fill out a "time off" request on the first day of her vacation.

37. Thereafter, Wade began treating Plaintiff even worse, especially in comparison to similarly-situated male co-workers; Wade began incessantly questioning the decisions made by Plaintiff and

moved to require that any decisions going forward, regarding training or tools needed for the Technicians, must be approved by him.

38. In every manner in his interaction with Plaintiff, through body-language, decision-making, and even overt statements, Wade mistreated Plaintiff because she was a female; taking a markedly different attitude towards her than he did towards any similarly-situated male employees.

39. Additionally, Plaintiff from time to time, Plaintiff overheard and/or saw Wade making derogatory, sexually-discriminatory comments about her to customers and co-workers, as just one of many examples, Plaintiff was copied on an email from Wade to a subcontractor in which Wade referred to Plaintiff as his "Accounting Chic."

**The Work Product of Plaintiff's Female Co-Worker is Questioned**

40. Wade later informed Plaintiff that he was concerned about a co-worker, Alicia Casso's performance: she allegedly was not bringing in enough money to support her salary according to Wade.

41. Plaintiff asserted that Casso was never given support by the prior General Manager and told Mike Wade that she would further support Casso.

42. Following this conversation, Plaintiff and Casso sold numerous contracts together; Plaintiff, Casso, and one other employee grew the service department to bring in 30% more revenue over the 9-person construction department, following Plaintiff's dedication to Casso's performance.

43. Despite this, Mike Wade was not satisfied, telling Plaintiff that *Plaintiff* was accountable for Casso and that she should consider "the team" when looking at both of their salaries.

44. Casso, on her own behalf, suffered numerous acts of sexual discrimination and also reported suffering through a hostile work environment, ultimately leaving C&C herself due to Wade's conduct.

45. Prior to her leaving, Casso reported to Plaintiff that she felt she was being mistreated by Wade

7

because she was female and reported that Wade was clearly hostile to female employees.

46. Wade's behavior, as Plaintiff noticed, *was* noticeably hostile and sexually-discriminatory against Casso; yet Wade's behavior was markedly different towards similarly-situated male employees.

47. In short, in addition to acting in a sexually-discriminatory, hostile manner to Plaintiff, Wade essentially "picked on" Plaintiff's female co-workers to the extent that they were driven out of their positions and then would blame *Plaintiff* for the employee's leaving.

**Plaintiff, Due Solely To Her Gender, Is Told to Resume Only "Woman's Work" and Subsequently Scolded for Following Orders.**

48. Plaintiff later assumed the role of helping with the "Accounts Receivable" collections for the Service and Construction accounts

49. Plaintiff assumed this role due to Wade's preference that she "stay out" of anything to do with matters of construction; Wade and McVey told Plaintiff and others that they considered the collections to be "woman's work" and thought it be best that Plaintiff simply handled the paperwork.

50. Wade then informed Plaintiff that he would assume control of those accounts whose payment was past due, claiming that "the hens" were bickering about the past due invoices.

**Plaintiff Again Pleads to C&C Regarding The Continued Harassment Inflicted Upon Her But C&C Takes No Meaningful Action.**

51. On January 11, 2018, Plaintiff sent an email to Wade to again request help with Landwehr's harassment towards her; Landwehr's harassment had been continuing for over a year at that point.

52. Wade again took the same hostile attitude towards Plaintiff's complaints as he had previously, this time, sending out an email to everyone concerning the "restructuring" of the office responsibilities, and in the email, he publicly embarrassed Plaintiff by stripping her of any and all responsibilities she had related to construction, announcing that Plaintiff was no longer going to handle construction at all.

8

53. Instead, Wade announced, everything in that department would now be handled by McVey, a male employee. Wade later told Plaintiff that his completely removing her from construction was done to keep her and Landwehr in "separate corners."

54. In response to that email, Landwehr emailed Plaintiff, ridiculing her on her new responsibilities, saying that maybe Plaintiff should work from home to "ease her stress."

55. Plaintiff forwarded this email to Wade.

56. On January 16, Wade responded to Plaintiff's original email requesting help regarding her harassment. He stated that he discussed Plaintiff's "issues" with Landwehr and claimed the "water cooler talk" will *now* stop.

57. Plaintiff responded to this email reminding Wade that he needs to take this seriously, and that she would contact Baragary in HR if he did not.

58. Mike Wade forwarded Plaintiff's email to Baragary and Strohm.

59. Strohm then called Plaintiff and told her that he was "sick of the drama" at the St. Louis office.

60. Plaintiff attempted to explain that she was not the cause of the "drama," but rather, the victim.

61. When Plaintiff asked if her job was in jeopardy over this, he stated "I don't have any pink slips in my pocket yet."

62. Strohm then informed Plaintiff that he told Wade to pull her and Landwehr "by their ears" into his office and settle this "nonsense" once and for all.

63. Strohm then asked Plaintiff if she was going to file a legal claim.

64. Plaintiff responded by saying that she was not sure what to do at this point. She told Strohm that Wade and Landwehr were affecting her credibility with her employees, subcontractors, and customers, along with constantly creating a hostile work environment.

65. Paul Strohm merely insisted that Plaintiff was "paranoid."

**Plaintiff is Again Undermined Due to Not Performing Her Duties the Way a Man Supposedly Would Have.**

66. On January 19, 2018, Plaintiff's Technician, Ryan Pullam, got into a truck accident.

67. In the past, Plaintiff had always submitted accident reports to Chad Cillessen.

68. Wade instructed Plaintiff not to contact Cillessen anymore, as Wade was now taking over.

69. Plaintiff was berated and belittled by Wade in front of her own employee, Ryan Pullam, about his accident:

   a. Wade told Plaintiff that she acted like his "mother" and coddled him after his accident, claiming that now he had to be the "dad" and scuff him up;

   b. Wade continued to yell at Plaintiff in front of Pullam with an entire written list of Plaintiff's wrongdoings, items Wade claimed were *Plaintiff's* fault that could have prevented Pullam from being in an accident had they not been committed.

70. On January 29, another of Plaintiff's technicians, Brian Schmidt, was in a truck accident.

71. Schmidt called Plaintiff at 7:30 p.m. to report the accident.

72. Plaintiff made every effort to take care of the situation that night for Schmidt, including securing a hotel and a tow truck.

73. Plaintiff called Wade twice that night to report the accident.

74. Both calls went unanswered.

75. The next day, Wade lectured Plaintiff, describing how the prior Service Manager, who Wade emphasized was a "man," would have handled the situation.

76. At this point, Mike Landwehr continued to undermine Plaintiff behind her back and Mike

10

Wade's intimidation and abuse only worsened.

**Plaintiff Again Pleas to Defendant to Take Action, but Defendant Again Belittles Plaintiff's Claims**

77. On February 9, 2018, Strohm and Baragary came to the St. Louis office.

78. At the end of the day, Strohm and Baragary called Plaintiff into Wade's office to discuss the "water cooler talk."

79. Plaintiff reported the following:

   a. Plaintiff explained that Landwehr had repeatedly told people that she had a "man's job" and that "all" Plaintiff does is "coddle the technicians."

   b. Plaintiff also explained that Landwehr was heard telling people that the two remote days in which Plaintiff works from home are her "drinking days" because "women get too stressed out."

   c. Plaintiff also stated that, Landwehr claimed that C&C could hire a secretary to do Plaintiff's job.

80. Wade was informed of, *inter alia*, these facts at least three months prior, but never shared the information with Strohm or Baragary, despite having the obvious responsibility to do so.

81. After about 10 minutes of listening to her, Baragary definitively concluded that Plaintiff did not have a harassment claim.

82. Neither Baragary nor Strohm talked to any other employees that witnessed the harassment.

83. Throughout the remainder of the month of February 2018, abuse from Wade continued.

84. If virtually anything went wrong in the office, Wade inexplicably blamed Plaintiff.

85. On February 14, 2018, Landwehr left C&C.

86. Wade took the position that Landwehr had left because of Plaintiff's complaints, and demeaning asked, "are you going to do his job now?"

**Plaintiff Is Ordered to Refrain from Attending a Meeting with Men**

87. On March 8, 2018, McVey asked Plaintiff to attend a meeting at a customer site for him because he was overbooked.

88. As Plaintiff was preparing to leave, Wade stopped her and said that he would go instead, as it was a meeting with "just the guys" -- all his male colleagues.

**Plaintiff's Resignation**

89. When Mike Wade returned from the meeting, he pulled Plaintiff into his office and closed the door.

90. He informed Plaintiff that he was going to fire Brandi Goulart, Plaintiff's daughter, and a Service Coordinator who helped Plaintiff increase the service department's revenue to be 30% of the construction team.

91. As Goulart is one of Plaintiff's employees, Plaintiff questioned this decision, saying that Wade never discussed this nor inquired with Plaintiff about Goulart's performance; in addition, Plaintiff questioned why he would fire an employee from the 3-person, wildly successful services team when the 9-person construction team was not bringing in the same amount of revenue.

92. Wade proceeded to question Plaintiff's salary, bonus, and car allowance, claiming that she made "more than enough money" to handle Goulart's workload.

93. Plaintiff was, again, accused of not doing everything necessary to help the team.

94. Wade terminated Goulart's employment that day.

95. Plaintiff, unable to continue working in an environment so obviously and overtly hostile to her

12

due to being a woman, decided she would resign.

96. On March 15, 2018, Plaintiff sent an email to Wade with her resignation,

## COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE VII

97. Plaintiff incorporates all preceding paragraphs as if set forth herein.

98. The Defendant's discriminatory actions, the creation and maintenance of a sexually-discriminatory hostile work environment, violated 42 U.S.C. §§ 1981 and 2000e *et seq.*, ("Title VII").

99. At all times pertinent to this matter, Defendant employs over 250 individuals.

100. As such, Defendant constitutes an "employer" under Title VII.

101. Plaintiff, as a female, is in a protected class under Title VII.

102. Plaintiff was discriminated against by being forced to suffer through a sexually-discriminatory hostile work environment in which she was, due to her being female, and over the course of her employment, subjected to, *inter alia,* all of the behavior described *supra* herein, improper and derogatory conduct and treatment that Plaintiff's male co-workers were not subjected to.

103. Defendant did so knowingly and with a discriminatory motive, and with malice and/or reckless indifference to Plaintiff's rights.

104. As a direct result of Defendant's sexual discrimination, Plaintiff has suffered pecuniary and emotional damage.

WHEREFORE, Plaintiff requests that this Court enter its judgment in favor of Plaintiff and against the Defendant as follows:

  a. that Plaintiff have and recover compensatory damages for past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

b. that Plaintiff have and recover punitive damages in an amount appropriate to punish and deter Defendant's conduct, as aforesaid:

c. that Plaintiff have and recover her reasonable attorney fees pursuant to Title VII provisions; and

d. that the Court award Plaintiff such other and further relief as the Court deems just and necessary.

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: /s/ *Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood, Webster Groves, MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*

14